I represent the Chi-City of San Diego Colleges. With me is my associate, Sir Jamie Metzler. We will respectfully request some time. Thank you very much. I thank you for facing these three issues of fundamental issues before us today. This is an Asian justice case. It is brought under a very special section, section 16, of the Planned Parenthood Justice Act. Section 16 allows an individual to challenge infringers that have been involved in a substantial and possibly report of the United States and the United States case. The challenge here is a violation of section 7 of the Planned Parenthood Justice Act, and in addition, subsequent to section 1 of the Planned Parenthood Justice Act. When this case comes to this court under Rule 12, it sits on the basis of a motion to dismiss the fundamental questions that the court has to assure. Respectfully, the first is to the Supreme Court decision in the 1960s and 70s in Florida. Unempowered or not empowered, no one seems to want to face them. The only court that has faced them in the last 34 years is the South Surrey Transposer. He made it very clear, he made it very clear, those cases have not been overruled, and they are the governing factor in the merger cases. Even though he instituted it, and even though they slew, or at least helped us on our system, our opinion, and even though the Department of Justice offered its own views as to the guidelines and terms, the question is, are these cases found? The court below ignored them. It's the defendants who have put them in. And that's usually one of the kinds of things we do. So, how does the plaintiff have to trust or go around listening to the plaintiffs? Are we entitled to rely on the Supreme Court decision to ignore them? That is, of course, a very important question. Essentially, yes, are we entitled to not refer to it in the best interest under Section 68? Again, the Supreme Court has been very clear in the American sports case that we are. But it's not unusual. How can you refer to a decision with all of our consenters? How can we stop a merger or have a condition that's above $60 million to $70 million? Well, you can tell us how we said so, but the courts don't want to say so, except the Supreme Court. Supreme Court, we are asking you this morning to please confront those Supreme Court decisions and confront them the way you're supposed to do it. And tell us why we're not devaluing them on the Supreme Court basis. The fact that the NHS Division has been named to be involved for reform litigation in policing the merger is the only agreement in this history that provides some firewalls and checks and balances and government instructions and those sort of things. The termination to be taken is that it is perceived that there is an unfair competition. It's not fair to measure the odds here, Your Honor. It seems to be a double-edged sword. Because when you talk competition, it's a DOJ contract. And it is for a very long time. And a number of courts have treated it as if it's a semi-conflict with the DOJ. DOJ contracts don't mean that they do whatever they do. It's irrelevant. So I'm not against it. Your Honor, if you're agreeing with me, then we should just conclude this matter along the basis of the consent decree. It's just that your participation is ineffective because the government is now taking serious about discharging their duties Your Honor. No, I don't think it's ineffective. This is one of the issues that we're confronted with. The court is very clear that the DOJ, what the DOJ does, is irrelevant. The department is, in this case. In fact, our case states that we're in a state that's fully responsible for what the DOJ does. And it's a DOJ-based institution. It's based upon its intention of the so-called Merger Conflict. Those guidelines are not what Supreme Court decisions in Section 77 do. Let me just make sure I understand the whole import of what you're saying. So, we have a restructured market here, and we have the supposed exclusion of what's called the U.S. market. Are you saying that this is just your attack in looking at the parties in your one-on-one free transactions meeting? I mean, what are you saying in terms of the family on the edge, in terms of what we're benchmarking this in terms of the biology of it? In this particular situation, Your Honor, you have the largest growing company in the United States. We have the largest growing company in the world. And there was a constant constraint as we put it in, as we put it in our department. They were constrained by this, by Mordella. And the reason they were constrained is that Mordella found a particular pricing point that is very unusual in the Senate, and instead of lowering prices, it just changes its prices annually. That was the cost historically in the United States. But that's a question. And sometimes the growing company saw Mordella as more stressful, blocked by me by pursuing a fair market in the United States, continually lowering senior prices, and never has been. They're not competing on price. They're also competing on advertisement. But they couldn't continue to raise their price because Mordella was keeping its price stagnant. And as a result, Mordella has a higher price a year, a better quality bid. And as the AP, the two senators of Washington, began to raise their prices, they got close to the price of Corona or the Mordella pairs, and people were beginning to pay up. And that meant that Mordella now was increasing its market share solely because it was keeping its price at that level. The key message, I think, first of all, I want to say, the so-called post-emergency, the so-called post-emergency strategy, that's turning votes into music, is usually a strategy for the courts and for the education purposes only. It probably doesn't have anything to do with reality. The reality is we've got to shut off this program by Mordella and have this ceiling. So that post-emergency, which, by the way, is not a very high-quality program, but as you can understand, if you don't raise your price following the price, you're not going to lose market share. I think this is effective, for sure. And, of course, as far as free incarceration is concerned, there are no clauses to the form of the AP and, again, it's to the idea that you have to, of course, you have a quality of life that you can get. So how are you able to let it show the difference? It's good to know yourself as an attorney, so when you get 30% around your market and with yourself in the AP, so you're giving rise to the constitution that doesn't actually care. I understand what you're saying and it doesn't look like you understand what you're getting, but is that what you want? Do you want to learn some theory? Your Honor, under Section 7, under Amendment R-22 under Section 16, incident and systematization, the cost going to the occupant compared to his case is that the quality is going to go down and the price isn't going to go up. It has to be class-coordinated to be categorizable correctly. However, under this statute, specifically, it is, it may, it has to have a specific purpose to want to do something about the occupant. So what the institution is, the institution is sitting at the verge of going through and what's going to stop it is that the price is going to go up and the quality will go down. On what basis? The question is the question. And so that's a complaint because since the Modelo passed this program, the Constellation was here after. So what they did was, they violated it. They settled it for a reason, the Constellation. How? The Constellation didn't raise the price just as they were begging Modelo to do before. And they didn't. And they did it during the riots. The riots in the District Court. And this is what was going to stop it. And they always talked about it because it stopped it actually during the riots. And what happened was, that when Constellation took it and it began to not only raise the price, but it would be for the price either in addition to what they had said. And in addition to what they had said, this new ordinance, remember what it's about? Emotions and suspense. And it's the food sticking out was now going to be painted. So it's going to go up. And it's going to go up. It's not going to be in the ceiling anymore exactly as we said it would have been. And how is it going to be? Is it going to be released on our way after some past restrictions or a few things? Now, we know because we don't know the circumstances. None. But we knew that we knew from the press releases and from the government's complaints. We knew that Constellation was complaining to Mondelo that rather than go up in price, forget the guarantee that they could sit there and forget again. Forget them. Forget that. This is just not the decision we made. We've sold food. No one can say it's been adjusted. And Mondelo refused to do it because it was gaining market share because people weren't coming over. But because of independence, there's no way on earth that something like Constellation can happen. But of course, Constellation didn't exist in all the major Supreme Court cases. It didn't exist here. But remember, in the Falstaff and Saul hearings, in the Falstaff, in terms of the enlistment paper and vice versa, Mondelo had a special interest in the Falstaff case. And he was acting as a lobbyist. But it's important. It's important to state the fact that in Falstaff, Falstaff was a major grower of the Marines. And the Fondra divine number 10 can't possibly come up to the Supreme Court. The Fondra divine number 10 is no exception. And they said the only way they're going to win there is by acquisition. And so, there's going to be no increase. There's going to be no additional concentration. The Supreme Court rejected that. And it said that you constrain the price by being here. And it's like, oh, you're being on a borderline of an arrest. You can be a moral barrier. You are a threat. What is going on? You should remember what is going on. The point here with the Falstaff is to say, okay, well, that number is not going to change unless you change your mind. But, you should see your sources and what's on each one of them. So, the point is, if you really wanted to do this, that if you were alleged to be in a situation that you indicated that there were some legal breaking information or special evidence or something, that you would have alleged or you would have reached out to people and held them accountable for that complaint, what additional allegations would you make to say they would save the system? First of all, you have to say that and then when you said that you were going to do this, what's the additional thing to do? Screens was eliminated by the Falstaff case. The judge says in the complaint that the employer of Sharon's hotel which you can see, there is a reminder that it has been screened down from rates and prices because the company has the rates and prices that they lose to people making the trade-off. And as you saw in our complaint, she herself said  was in college. Her hotel was not within the college. Her hotel was screened down prices. So, this kid, this guy, has never been in a real business. He's coming in, has nothing to do with the fact that this is what he would have done in addition to what an agent would do if they put him coming in to pay any cost of investment. Pardon me, pay any cost of investment? Well, they bought the hotel and brought it for installation. What did they do for the cost of installation? They supplied the beer, they supplied the hops, they supplied the beers, and they did all this for a certain budget. So you are saying those instances occurred when a homeowner complained about increased cost of investment? Well, yeah. You are taking these complaints down the revolution. But now as you say, you are bathing and I'm convinced that that is so detrimental to the economy  it is very significant that you are demanding that the economy should increase. Yes. Well, I think there should be a new action now and that is the idea that we should have a new  for that      new action for that. So I think that we should have a new action for that and action for that. And I think that we that. And I  that we should have a new    I for that. And I  that
judges: McKeown, Wardlaw, Tallman